For Wilcox, get out. This is Wildwell. Control, get out. May it please the Court, when Wildwell claimed the benefits of employer status, it told the district court, and I quote, Mr. Wilcox's work was directed and controlled by Wildwell. Max exercised no control. Wildwell supplied the tools. Wildwell provided the location. Wildwell had the power to terminate Mr. Wilcox's employment. In essence, Wildwell paid Mr. Wilcox. That's from their motion for summary judgment? This is the memorandum in support of their motion for summary judgment on the indemnity under the Exclusive Remedy under Longshore Act, Section 5A. We agree. Wildwell was Mr. Wilcox's employer, not just as a legal matter, but for all practical purposes. He worked as a member of the vessel's crew. All he asks today is for this Court to recognize the logical implications of the fact that Wildwell was his employer. When evaluating whether he was a seaman with respect to Wildwell, the fact finder should look to the period of his employment with Wildwell and apply the Supreme Court's test accordingly. The Court below did not do that. The only support for the view that a worker's status with respect to one employer should be evaluated by reference to his period of employment with a different employer is the new double or nothing dictum, the thought that you're a seaman or not with respect to one employer determines your status with respect to another employer. That dictum is neither binding nor persuasive. But that's a published decision, and it's fairly elaborated logic from Judge Rubin. Well, the fact that this Court affirmed the district court's ultimate judgment doesn't make it binding, and I have three reasons, at least three reasons for that. First of all, there is no evidence that this Court considered, let alone addressed, the double or nothing dictum. Secondly, it's implausible that Judge Rubin was endorsing the double or nothing dictum because it would be inconsistent with this Court's prior decisions in Lefler v. Arco and in Guidry v. South Louisiana contractors. All these cases precede Chandris. All of them. And that's my third point, that even if this Court had blessed the double or nothing dictum, that was in 1989, before the four Supreme Court cases addressing seaman status in the 1990s. And if we look at those four cases and consider what impact they have, we see that the entire discussion in New regarding the correct period of employment was the Barrett change of assignment doctrine. It's pages 1208-09 in the New decision. Now, we don't think the change of assignment doctrine is relevant in the context of which employer you choose. In our view, the change of assignment doctrine determines whether you can look at a shorter period within a given period of employment with respect to a particular employer. But even if it were relevant, the change of assignment today is the Chandris change of assignment doctrine, not the Barrett change of assignment doctrine. Although the language in Chandris is pretty similar. The— Permanent reassignment of essential duties. Chandris never uses the word permanent. Oh, it doesn't? I take it as a no. If you look through Chandris, they cite the Barrett decision, the majority decision for some points. But when it comes time to talk about the change of assignment doctrine, Justice O'Connor very  And in his Barrett dissent, Judge Rubin had a much more flexible view of change of assignment. In fact, he gives the example, Judge Rubin does in his Barrett dissent, of a shore-based cook assigned, I'm quoting here, to a ship's galley for a voyage of one or two weeks duration. And he gives that as an example of what would count as a change of assignment. Do you agree that if there is tension, Guidry, Roberts, New, put it all aside, just try to look at Chandris. But Chandris does seem to emphasize connection to a particular vessel's got to be substantial duration and time. Duration and nature, yes. Duration and nature. Two months with one vessel as a welder. What case gets the closest to that? Okay, well, two points here. In terms of the connection in terms of duration, the Supreme Court has always done it in percentage terms. Right. So it's clear that if you spend 100 percent of your time in a very short employment— But then if we stack the max time, then you lose. If you do consider in the denominator the time with max or all the other assignments, then you would lose. The—yes, our argument here today is that you need to look at the relationship with the employer against whom we're claiming seaman status. Now, in terms of, you know, does one day, two months, seven or eight months matter? That, I think, goes to nature, that it's much harder to establish a substantial connection as to nature if you're not there very long. You need to look at what's being done. In fact, I think there's—it is most likely that this Court affirmed the judgment in New with respect to the borrowing employer on what in today's terms would be considered failure to satisfy the nature requirement. If you look at the briefs in New, no mention of the double or nothing victim. The only argument that the borrowing employee—employer makes is that he wasn't doing a seaman's work. Now, this is pretty chandrous, but in chandrous terms, that would be that he did not have a sufficient nature connection. So the—now, of course, we have not appealed against max, so we've not renewed our—a change of assignment argument in this Court. We haven't conceded that there was no change of assignment. We simply haven't renewed the appeal, primarily because it wouldn't do us any good to have seaman status with respect to max because max wasn't the employer who was negligent. Being a seaman with respect to max gives us a Jones Act claim that would fail for lack of negligence. So the appeal here is the appeal with respect to Wildwell because Wildwell was the—was the seaman employer. But if you apply the proper change of assignment doctrine, which is what Judge Rubin advocated in the Barrett dissent, Justice O'Connor also cited footnote six in this Court's Longmire decision, in which Judge Randall, as she then was, took a much more flexible approach to change of assignment doctrine. Now, taking Judge Rubin's hypothetical, the cook assigned to a two-week voyage on a ship changed assignment. We've clearly met that here. I see my time is up. Thank you, sir. You have time for rebuttal. Thank you. Mr. Hannan? Good afternoon, Your Honors. Jeff Tillery. May it please the Court, Jeff Tillery on behalf of Superior and Wildwell. If the Court decides to overrule Barrett and New, here's what would happen. A man like Mr. Wilcox would walk in and out of Jones Act coverage each time he left the Max Welder's facility and was assigned to a new job. So, when he went to work for Wildwell, he would be a seaman. He'd come back for a couple weeks. He'd be assigned to a platform. He would not be a seaman. He would come back. He would go to another place where he might work on a vessel. He would be a seaman. It's exactly what Chandris and Wielander said. We need some consistency. We cannot have people walking in and out. Is the Supreme Court contemplating that, though, and is it pronounced Popeye? Popeye. I think it's Popeye. Yes, Your Honor. I think that was the contemplation. Do not walk in and out of coverage. We need some certainty to this situation. But I thought there the Court said, well, look at your current employer. And in that particular example, the person was a seaman as to the shift that he was painting for a day. Right. And that's his current employer. And there was no prior employer. Their contention is here, Wilcox was currently employed by Wildwell, right? Currently employed. No, he was employed by Max Welvers. He was assigned to a job which for Superior and Wildwell, where he just happened to also be the borrowed employee of those companies. But the summary judgment motion he's reading from is profuse for a dozen pages about how Wildwell had unique, complete hiring control tools. Question about it. And that's what New specifically said. So it's not a happenstance. It's a current employer in all capacity. You would have to overrule Barrett v. Chevron to get to what you're talking about. Well, but Barrett's this changed employee. They're trying to say that they're addressing the 30% rule, as I understand. I mean, and so we're just saying, when do we start that clock? You start that clock if and only if it was, according to Barrett v. Chevron, a permanent reassignment to a new location. That's no evidence of that. They're saying more a version of the Roberts rule, which is, well, it's an indefinite assignment. He's a welder for one. He's a welder for the other. Forget the employer. Judge Afric hit on that. This is not indefinite. This job was to last two months. It's evidence in the specific record in Judge Afric's decision. This was a two-month job. And the affidavit evidence was, Your Honor, that he was going to be back reassigned to Max Welvers two months later. And he was going to go to some other job. That was the evidence. Now, you know what the hypothetical question then is going to be. When's the cutoff? Let's say it's a two-year assignment. Do—when do we— Oh, I understand. It's a two-year—then you—if it's a two-year assignment, let's assume it's a two-year assignment, then you still look—it was a temporary—you still look at his entire employment with Max Welvers. And if that took him over the 30 percent rule, maybe he'd be a seaman at that point. If—in other words, if it's still a temporary assignment, you look at his whole— It's sort of an elaborate formula, but you're saying that's what we've been told. But the Supreme Court didn't say that 30 percent rule is fixed. It's a guideline. It's a real good guideline, yeah. It definitely said it's a real good guideline. In most cases in this district, grant summary judgment if you're below 30 percent. Did Wilcox ever work for Wildwell before? Does the record reflect whether these— No, he worked for 191 different jobs for 34 different companies, reassigned as a Wildwell. Never worked for Wildwell at all. He only worked for Wildwell for a short time. Essentially, what we have, Your Honors, is if you revert—you have a decision that was not appealed. You have Judge Afric deciding that he was not a seaman as to Max Welders. My opponents did not appeal that, okay? So you have a decision that's not before this Court. So if you decide now he is a seaman as to Wildwell, we'll have two separate decisions. We will have he's a seaman as—Mr. Wilcox on this job was a seaman as to Wildwell, but not a seaman as to Max Welders. And in New, it says the plaintiff is either—is or is not a seaman as to all employers. Um, we have essentially a law of the case ruling here. During his employment with Max's payroll employer, he didn't meet the temporal requirements. He was not assigned to an identifiable fleet. New specifically says borrowed employer is not equal Jones Act status. Borrowed employer deals with control and instructions and orders. Seaman status test is different. Seaman status test is were you permanently assigned to an identifiable fleet, et cetera, et cetera. The simple fact that Mr. Wilcox was assigned temporarily to work on a job where the people he was working for simply became his borrowed employer because they gave him the orders does not mean he was permanently reassigned to that job or his essential job duties changed. If you—if you do so, you'd have to overrule New. You'd have to overrule Barrett v. Chevron. They all precede Chandra's. They all precede Chandra's, but each—all of the cases that have come since then, nobody has said Barrett v. Chevron has been overruled. And in fact, all the district judges have been following Barrett v. Chevron regularly, Judge. They have. That's true. No, I agree on the Barrett point. The new arguments—his point is in Chandra's, they're citing Rubin in a dissent in Barrett. No, I understand that. So— And one thing you raise, Judge, I just want to mention. You say, what if we do look at his employment? What if we just decide today we're going to look at his employment with—with Wildwell, while he was assigned to Wildwell? If you do that, the evidence in this case is, Judge, at REC DOC 15-4, page 2 to 3, page 14 of Judge Afric's decision. Judge Afric specifically cites the record, his—most of his work here was on the platform. Even when he was working for Wildwell, most of his work was on the platform. His primary job was welding on the platform, and that was admitted to in the deposition by Mr. Wilcox himself. So still, even in this case, should you choose to go that route, and I say that you shouldn't, he still spent most of his time on the platform, not on the vessel. Where was the injury? Is it in the—on the platform? On the platform, Your Honor. And what's interesting is that—let's remember, the plaintiff has the burden to come forth with the evidence of the 30 percent. So should you choose to take the route that our opponents would like you to take, they still haven't met the burden of proof on the 30 percent, based on page 14 of Judge Afric's decision and the record. So I haven't used all my time, but I've rambled long enough. Thank you. Mr. Sterling? Thank you very much. Let me just begin with the point at the end, that whether or not Mr. Wilcox has satisfied the 30 percent with respect to Wildwell is, of course, an important question, and it's a question we would like the district court to answer on remand. It's not the question here. The fact that he was injured on the fixed structure is, of course, completely irrelevant. If you look at the Wielander decision, John Wielander was also injured on a fixed structure. But the fact is he was a member of the crew of the paint vessel, working from the paint vessel and doing the work he was doing, just as Mr. Wilcox was working from the superior performance in the work that he was doing, in support of the mission of that vessel. Now, Wildwell is very concerned about walking in and out of coverage. What we're really talking about here is people getting different jobs. I don't think there's any dispute that if Mr. Wilcox had gotten a different job, he would be considered as a seaman or not a seaman, according to his relationship with that employer. If you look at the Roberts case, Mr. Roberts starts his employment with Williams & McWilliams, two days later he's injured. He was doing exactly the same job for Williams & McWilliams that he had been doing for, I think, 14 years before that. But he has a new employer. That's a new employer indefinite to the future with really no time with the original employer. Well, I mean, he'd had 14 years with previous employers. The difference is that they're simultaneous here. They weren't simultaneous in Roberts. So he'd given up his prior employment and now he's starting a new employment. Wildwell is really trying to have it both ways here. They're saying, yes, absolutely, we are his employer when we want the benefits of Section 5A of the Longshore Act. Give us all of the benefits of being an employer, but don't treat us as an employer when it comes to any responsibilities we might get. But aren't they saying that they aren't denying that they would be a Jones Act employer? They're contesting his seaman status. Well, I mean, seaman status and Jones Act employer are the correlation with each other. If they're a Jones Act employer, then Mr. Wilcox is a seaman and vice versa. They're saying we're the employer, but we're not really the employer. You have to look at his real employer to decide whether or not he's a seaman. But another way of saying it is they're just saying, what's his longstanding substantial connection to this vessel? And they say it's not much. Well, I mean, first of all, Mr. Wilcox had previously worked on this vessel. He did have at least three assignments on this vessel. Yes, but nothing really turns on that. That doesn't get him up to the 30%. He spent a little over two months on this particular assignment to this vessel. How long he would have continued requires some speculation. The best estimate we can come up with is he would have had about seven or eight months. The particular job he was on ended about two weeks after his injury. However, his fellow workers with Max, who had been loaned to Wildwell, then stayed on the vessel to do another job, and then they went from job to job. That crew stayed on the vessel for seven or eight months until there was a second explosion. At that point, Max said, we have too many safety concerns with Wildwell. We're pulling our crew off. Is Popeye relevant to your argument at all or not? Oh, absolutely. It's strongly supportive of our argument. You've got to remember there are two things in Popeye that the Supreme Court was addressing. Popeye made two arguments for why he was a seaman. He said he spent about 70% of his time doing seaman's work with respect to all of the different employers. So he made a fleet argument, and the Supreme Court and Popeye accepted the Barrett fleet approach. But he had a second argument, which was, even if I'm not a seaman under that test, you should treat me as a seaman for my one-day employment, which I was injured. Supreme Court said, no, you don't satisfy the nature test. You didn't go to sea. Obviously, Mr. Wilcox went to sea. He satisfies, we contend, the nature test, but that's a question on remand. Now, we also just heard that Wildwell was very concerned with the possibility that there'd be inconsistent determinations, that a particular employee could be a seaman with respect to one employer and a non-seaman with respect to a different employer. Hardly surprising that in a relationship-based status test, people have different statuses with respect to different people. I'm a husband with respect to my spouse, a father with respect to my children, a son with respect to my parents. That's not surprising. What's more, in Guidry, this Court has already recognized the possibility that you may have different statuses. In Guidry, there was a sea-based employee. His regular employer was a barge owner. There was a land-based project. He was temporarily assigned to work on the land-based project. And this Court affirmed the District Court's ruling that he was not a seaman with respect to the land employer. He didn't satisfy the appropriate test. This was pre-Chandrase, but didn't satisfy the seaman status test in effect at the time. And an opinion by Judge Rubin remanded the case to the District Court to determine whether or not he was still a seaman with respect to his regular employer. So this Court clearly recognized and wasn't troubled by the fact that you can be a non-Jones Act seaman with respect to one employer, while simultaneously being a seaman with respect to a different employer. So we don't have, you know, the problems that they're concerned with are not problems. The—and then finally, this is the point Judge Higginson, you and I were talking about near the end about what was the proper test under Vera or now under Chandrase. The language that the Court endorsed in Chandrase was not permanent change of employment, even though we keep hearing that. It was regular and continuous rather than intermittent. And certainly during the two plus months that Mr. Wilcox was on the Superior Performance, his connection with the vessel was regular and continuous, not intermittent. He was there 24-7. Thank you, sir. We have your case. That's the last case for today. No, I think they split them up. I'm sorry. Unless you want to waive the second half. I'm sorry. I'm sorry. This may have pleased the Court. Jeff Hillary on behalf of Superior and Wawa, this is the contract issue. I am the appellant. I lost at the lower level, obviously. This is a contractual, here we go again, defense and indemnity issue. At the end of the day, Your Honors, I do not, I, my client does, do not need indemnity if you affirm the semen status ruling by Judge Afric. Because if you do, the man has no tort claim against Wildwell or Superior anymore. And therefore, I'm not, I don't need to be indemnified yet for that. He is getting work's comp. He is getting, we're not hiding. He is getting work's comp. His medical bill's paid. So this, if you affirm the decision of this, this is more of a seeking defense cost, so to speak, if you affirm it. If you don't, I want defense and indemnity too, obviously. What I'm going to ask the Court to do in the remedy that I'm going to ask to seek is this. I'm going to ask the Court to affirm Judge Afric's semen status decision and to rule that our claim for defense fees under the Malloy decision is premature. And that we have to go file a suit somewhere else or bring it later. For this reason, I'm also alternatively going to argue that you should reverse and grant my summary judgment on the Malloy fees on defense fees too. But first, what happened in this case was Judge Afric granted the motion for summary judgment of Max dismissing Wildwell and Superior's defense and indemnity claim on the grounds that the Anti-Indemnity Act avoided it. Okay? This is the MSA. I'm dealing with the first contract, the MSA, Master Service Agreement. Judge Afric made this ruling and did not determine whether the MSA was applicable to this situation. And it was before he found Wildwell and Superior to be free from fault. Before he found Wildwell to be free from fault. At some point after he issued his ruling on this defense and indemnity, he found Wildwell and Superior to be free from fault, no vessel negligence in February of 2014, and a judgment was issued. Everybody appealed. That's where we are today. If, in this case, the MSA is applicable to the work. If it is applicable to the work. And if the Anti-Indemnity Act avoided it, and we say it does, we agree with Judge Afric's decision on that. But the Anti-Indemnity Act says that I, Wildwell, still get defense costs if I, Wildwell, and Superior are free from fault. So if I, Wildwell, and Superior are free from fault, the Anti-Indemnity Act may void the defense costs. But what Molloy and the Supreme Court have said is that the cause of action for Molloy fees, the defense fees, does not arise until the lawsuit is concluded and until the defense costs are paid. So in this instance, the lawsuit really is not concluded because you have not ruled on the semen status issue. So arguably, I guess, what I'm going to ask the court to do is to affirm the semen status and rule that my claim for Molloy fees is premature and that I need to go deal with that later. I need to go decide my defense costs later on. That would be my first request of the court. My second request is, alternatively, step to the plate here, Your Honors, grant Wildwell, reverse the summary judgment granted in favor of rights, and grant Wildwell's summary judgment and find that the MSA, the Master Service Agreement, was applicable to this situation. Because there's an affidavit of amending, Mr. Guidry, that says it was applicable. And we made all sorts of arguments, technical arguments, in our brief that we don't have time to talk about here. But the primary argument that I like the best, that I'd like to put on the table, is the words of the indemnity clause in the MSA say, the claim need only arise out of the performance of this agreement or any purchase order. It needs to arise out of the performance of this agreement or any purchase order. When Wildwell called Maxwellder's and ordered Mr. Wilcox to come work, it was a verbal purchase order. It was a verbal purchase order of Maxwellder's work. Paragraphs 1, 2, and 3 of the MSA discuss verbal purchase orders as something that is contemplated by the agreement. So in this instance, I submit to the court that you can reverse the judge's decision on the applicability of the MSA and find that the MSA was applicable in this case because of the verbal purchase order in this instance. And when you do that, I understand it's void by the Louisiana Anti-Indemnity Act. I get that. But when you do that, you can then find that we're entitled to our defense costs under Malloy because the judge has already found us to be free from fault. And that was not appealed or briefed by our opponent. They haven't briefed the whole free from fault under Section 905B of the Longshore Act. I have two minutes to talk about the VBA. And your answer to their claim that you waived that by never bringing it to AFRIC's attention, your answer is, well, chronologically, it wouldn't have made sense? Yes, exactly. Couldn't have done it. Didn't have it. Premature, anyway. That's my argument. I know I have two minutes. There's a second contract. It's a maritime contract. It's the vessel boarding agreement itself. I understand that we, Superior Energy, sold the vessel to a family, a company within the family, to Wildwell. And I understand that at the time the contract was signed, that nobody went back and fixed that contract. No question about it. It was a mistake. I'm asking you to reform the contract. I know it's tough. I know it's hard. I know it's an equitable remedy that is difficult to do. I ask you to look at three things when making the decision on reformation. Mr. DeWolf of Wildwell issued an affidavit where he said the intent of these parties was clear, that when the Superior, when they sold the Superior Performance to Wildwell, the intent was for Wildwell to continue to indemnify Wildwell no matter what, in this particular instance. They just forgot to change it in the contract. Sandy DeReese, also a man, submitted a similar affidavit. Biggest thing I ask you to consider on reformation is the credibility of a man by Mr. LeBlanc. He was the man for Max Welders who, at first when I deposed him, denied ever signing the vessel boarding agreement. Then we got it and we showed him in the next deposition. He admitted that he did. And what he did was he faxed and emailed that vessel boarding agreement back to Wildwell. So that particular contract that he dealt with, he sent it back to Wildwell. He knew that that vessel boarding agreement required them to defend and indemnify Wildwell because Wildwell did in fact own the Superior Performance. At the end of the day, if you just look at the record and you look at everything, it is abundantly clear from an equitable perspective, the equitable side, the true intent was for Max Welders to indemnify them in this situation. At the very least, the very least, Superior Energy's name is on the vessel boarding agreement and Superior Energy should get defense and indemnity, at the very, very least. Thank you. Thank you, sir. I have not overlooked any. Pick up, Mr. Hanna. I guess I have. I guess I have. If Mr. Tillery hadn't argued, maybe I would have started letting him let go. Your Honor, it's Chris Hanna from Max Welders. I feel like I need a machete to hack through the vines and brambles on this issue on indemnity. But I want to start first only because— Then that wouldn't make you a seaman. It would not make me a seaman. It would just— To begin with— You're on land and you— Correct. There's no vines on the platforms. One initial point, the seaman status issue on the primary appeal has no relevance or whether you rule he's a seaman or not. Our argument is that there's no contract of indemnity whatsoever anywhere. So the seaman issue shouldn't infect or affect the indemnity issue we have. I feel compelled to address the credibility issue that Mr. Tillery raised at the end of his argument. Max Welders is a small outfit. They have three or four people in their management. Keith LeBlanc signed the VBA when he signed it because the guy who was supposed to sign it was out of the office on vacation. If you look at the emails that Mr. Tillery is pointing to in which he claims that Keith LeBlanc somehow knew that he was emailing this back to a Wildwell email address, that's just absolutely not what they show. This is at record 1656 through 58. Long story short, the chain of emails, the first email is from Keith LeBlanc to an email address that says fushunaviation at wwcmarine.com. I checked before I came. That URL extension is not a good email address. I mean, it's not a good URL. It doesn't say anything about Wildwell. The only place Wildwell shows up is in up-the-chain emails that were circulated among the Wildwell folks themselves. And in those emails, they're sending it to superior people for superior to sign. The VBA had absolutely nothing to do with Wildwell. So with that initial credibility point kind of out of the way, I'll say that the other side's arguments on indemnity in this case boil down to this. If there were a different contract with different terms signed by different parties for different work, they might be entitled to indemnity. But no such contract exists. Neither the MSA nor the VBA, which they drafted, applies to the facts of this case. Was there a verbal purchase order? There was a verbal purchase order. The way it worked was Wildwell would call Max Welders and say we need welders for a job. As I'll explain in a second, that verbal purchase order can't apply to the MSA for several different reasons. And it can't apply to the VBA because the VBA does not involve Wildwell at all, period, full stop. So whether or not there was a purchase order, a verbal purchase order, begs the question of a verbal purchase order for what? For what overlying contract? The only two overlying contracts that they've pled, well actually one of them they pled, the only one they pled is the MSA. The VBA was raised after the fact in a supplemental memo. It was never actually pled in the pleadings. Those are the only two contracts involved. And you have to tie a purchase order to a contract in order for the contract to apply. You were tying it to the MSA. And it doesn't, and I'll explain why in a second if that's okay with your honor. They'd have this court create from whole cloth an indemnity no one ever agreed to, much less in the clear, unambiguous, and unequivocally expressed terms that are required for an indemnity obligation. All their arguments are simply after the fact attempts to hammer a square peg of this case into a round hole of two contracts that they simply do not fit into. And the simplest way to put this is actually in the words of Judge John R. Brown of this court in what was a seminal indemnity decision, the Lanas versus Travelers case. Superior and Wildwell's argument is that the contracts, quote, do not mean what they say and mean what they do not say. That can't be the law and this court's indemnity jurisprudence is time and again, most recently in the Duval case, 722 F3rd 300, held that an indemnity contract can't be extended beyond its four corners. It has to be contained in the words of the contract itself. Again, to quote Judge Brown, indemnity, quote, can arise only from the plainly expressed interpretation of the parties manifested by language couched in unmistakable terms, not from mere after the fact judicial inference based solely on what the party seeking indemnity claims it intended to say but didn't say. Now, to go to Judge Higginson's question about the MSA, again, this is the only basis they actually pled below in the district court. The MSA does not apply plainly in black and white terms for four main reasons. First, the MSA is between max and superior. Wildwell is not a party to the MSA. They would fall within the company group as defined in the indemnity provision in the MSA, but they're not a party to the overall contract. Their name shows up nowhere in the contract. Following along with this, there's no dispute that there was no written contract for these Wildwell callouts where they were calling wax welders, welders out to weld on, in this case, on an ERT platform and there's no purchase order, written purchase order. There was a verbal one pursuant to the callouts. On top of that, there's no dispute that superior had no involvement at all in this ERT job. They were never out there, didn't have any people out there, didn't have any equipment out there. The second reason the MSA doesn't apply is in three different provisions of the contract, it says that the MSA only applies to work on superior-owned equipment or facilities. Section 1 of the contract says that. Section 22 of the contract says that, and it's all over the recitals. The third reason the MSA doesn't apply is because it only applies to non-demolition work on superior-owned equipment or facilities. Specifically, at Section 1, this is at the record, page 558, the contract only applies to, quote, inspection, maintenance, operation, repair, and other services from MAX in connection with superior's production facilities and or equipment. Now, you have to consider the generic term, other services, in the context of the list that it appears in. Inspection, maintenance, operation, and repair are not at all like demolition work, which is what was going on in the Wildwell callout on the ERT platform. Again, not a superior platform, an ERT platform, not inspection, operation, or maintenance, but demolition. In fact, the fourth main reason the MSA doesn't apply is that it only applies to work ordered by superior, which would make sense because superior was the only person in the contract who could order MAX to do anything under the MSA. Section 1, again, record 558, superior company may from time to time request work ordered by the company superior issuing purchase orders. Wildwell could not issue a purchase order under this MSA. It's not what the terms of the contract allow. There's other reasons as well. Mr. Sterling actually menued one of them. Wildwell supplied all the tools, the location, and the equipment for this ERT job. Section 7 of the MSA at page 560 of the record requires that MAX welders provide all tools, supervision, and equipment. Again, square peg, round hole. This ERT job does not fit the confines of the MSA. There's myriad cases on point. The Lanasz case from Judge Brown, the Chenette case, the Duvall case, the Corbett case. I would note that, and I was actually checking before I came up here, at pages 51 to 55 of their opening brief and 1 to 9 of their reply is where they address the MSA. There's not a single case cited that supports their positions on the MSA. To move quickly to the VBA, just as they did in the district court, they recognized midstream that the MSA wasn't going to fly, so they switched horses to the VBA. But as with the MSA, there's four reasons the VBA doesn't apply. First, again, VBA is only between MAX and Superior. Wildwell shows up nowhere in the VBA. In the VBA, there's not even a reference to a group that Wildwell could possibly fall into. It just refers to Superior as owner of vessels. Second reason, the VBA only applies to vessels owned, chartered, or operated by Superior. Again, Wildwell is not involved. It's undisputed that Wildwell, not Superior, owned the only vessel involved in the incident in this case, and had owned it for almost a year prior to the incident. The third reason is the VBA is not vessel specific.  It says this VBA applies to this owner, whatever vessels it owned. The district court recognized that Superior Wildwell actually subtly mischaracterized the VBA below by suggesting that it applied to this specific vessel. It didn't just apply to Superior. It's not what it says. And finally, and practically speaking, the VBA is not countersigned by anybody from Wildwell or Superior. It's only signed by MAX welders. All they do to combat these plain black and white terms of the contracts is throw up a slew of parole evidence which contradicts the plain language of the contracts, contradicts the facts, and in any event, can't change the legal conclusions that this court needs to draw from the contract. Parole cannot create a question of fact on an unambiguous contract. I want to quickly respond to the reformation. Actually, I want to respond to the lawyer argument on the Maloy defense fees. That was waived. They could have raised it in district court. They didn't. And this prematurity question is a little bit disingenuous because within a week after Judge Afric dismissed the indemnity claims, and this is at record pages 4878, 4879, and 4880, they knew that they were going to get barred employee status because there was a status conference with the judge where everybody agreed that they were going to get barred employee status. So they knew then, within a week of the summary judgment, that the Maloy issue was a live one. They had already cited Maloy for other reasons, and they never briefed it or raised it at all below. My time's up, Your Honors. I appreciate your time. Thank you, sir. That concludes the arguments for today, I think. This panel will be in recess until 9 a.m. tomorrow morning in this courtroom. Thank you. Pardon? Yeah, I thought I had to follow up. Sure, does he have it? We had re-divided the time, but I thought. Go for it. Yeah, you got three minutes. All right, I'm going to hit it hard. Three minutes. Fast, Your Honor. Number one. I had a bad sheet. That's why I'm messing up here. I think that we all confused. He had a sheet that was lost, Judge. I think all of us did it. Four or five quick points. Number one. The VBA, my opponent just admits, applies only to superior. So when you read it, Your Honors, at the very least, if you don't reform the contract to affect Y. Well, superior energy should get defense and indemnity in this case. And we've been in the case from day one. That's number one. Number two. As to all claims, regardless of where they originate? Yeah, the superior was never dismissed from the case until the bitter end. Always in the case, I defended them in conjunction with Wildwell, straight up, through the whole thing. Same defense, same thing. But if it's not on a vessel of theirs, not relating to their operations, Max Welder still has agreed to indemnify under the VBA? Yeah. Number two. My opponent argues that the, let's kick to the VBA one more. I'm still at the VBA since we did. My opponent argues that it was not faxed to Wildwell. And that's just wrong. Page 74 of our original brief, the deposition of Keith LeBlanc, who the man I was talking about, the credibility. I asked him the following question. First of all, did you read the vessel boarding agreement? I read basically the top, what it was, who it was from. Did you find it odd or strange that it was superior energy as opposed to the people you were working for, which was Wildwell? Answer, no. You faxed it back. After you signed it, you faxed it to your guy at Wildwell, correct? Answer, I think I emailed it because we noticed some emails back and forth. Question. And that was an email to Wildwell, correct? Answer, yes. And you were called for this and emailed to you from Wildwell. Answer, yes. So my opponent respectfully is wrong. He knew it was Wildwell. He knew Wildwell was involved. He testified to it. Lastly, with respect to the verbal purchase order, paragraph one, let's kick it again to the MSA because I have a minute here. The MSA itself, this question of the verbal purchase order, paragraph one, three, and two, one, two, and three of the MSA basically guts his argument because it specifically says provision of services and or equipment is ordered by issuing written or verbal purchase orders. Finally, and I will sit down, Your Honors, if you look at the intent of the VBA and the MSA, this is standard, typical oil patch. There may have been some little technical errors that things forgot about. But if you look to the guts of it and you look to the true intent and spirit of these contracts, there can be no doubt that it was the intent of Max Welders to share the risk for Max Welders to pick up the defense indemnity of these two entities. Thank you, judges. Thank you, Mr. Tillery. You're a person who is not easy.